IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

APRIL PERKINS                                                                                                    PLAINTIFF

vs.                                          CIVIL NO. 06-5215

MICHAEL J. ASTRUE[1], COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                                           DEFENDANT

## **MEMORANDUM OPINION**

April Perkins ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits ("DIB") under Title II of the Act.

**Background:**

The application for DIB now before this court was filed on December 4, 2003, alleging an onset date of August 22, 2003, due to depression, post traumatic stress disorder, borderline personality disorder, asthma, bilateral tendinitis in the shoulders, bilateral carpal tunnel syndrome, back pain, migraines, and knee pain. (Tr. 63, 147). An administrative hearing was held on December 13, 2005. (Tr. 557). Plaintiff was present and represented by counsel.

The ALJ issued a written decision on April 24, 2006, finding that, although severe within the meaning of the Regulations, plaintiff's impairments did not meet or medically equal an impairment contained in the Listing of Impairments in Appendix 1 to Subpart P of Regulations No. 4. (Tr. 17). The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") to perform

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

AO72A
(Rev. 8/82)

light work requiring only occasional grasping and fingering. Further, he concluded that plaintiff had moderate limitations in the areas of understanding, remembering, and carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; setting realistic goals or making plans independently; accepting instructions; and, responding appropriately to criticism. The ALJ determined that these limitations resulted in the RFC to perform only work where interpersonal contact is incidental to the work performed; the complexity of the tasks is learned and performed by rote with few variables and little judgment; and, the supervision required is simple, direct, and concrete. With the assistance of a vocational expert ("VE"), the ALJ then concluded that plaintiff could perform work as a counter clerk, demonstrator/promoter, or grader/sorter. (Tr. 16).

At the time of the ALJ's decision, plaintiff was twenty-eight years old with a ninth grade education. (Tr. 12, 60, 63, 564). The record reveals that she has past relevant work experience ("PRW") as a general laborer. (Tr. 12).

On April 24, 2006, the Appeals Council declined to review this decision. (Tr. 3-7). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 10).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's

4

determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Records reveal that plaintiff has a history of tendonitis in her shoulders, bilateral carpal tunnel syndrome, meniscal degeneration, and facet syndrome. (Tr. 271, 477). Further, record also indicate that plaintiff is overweight. The ALJ, however, failed to properly consider plaintiff's impairments in combination when he assessed her RFC. The Social Security Act requires the Commissioner to consider all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

The pertinent medical records reveal as follows. The evidence shows that plaintiff had a history of back and shoulder pain. On January 4, 2003, plaintiff reported continued back pain. (Tr. 243-245, 553, 552-553). Although there was no radiation, plaintiff did indicate that her pain was exacerbated by movement. Dr. Jeff Anderson noted spinal and paraspinal tenderness and diagnosed plaintiff with lower back pain and shoulder tendonitis. (Tr. 243, 244, 552). He prescribed Skelaxin, Vicodin and Zithromax. (Tr. 245, 553).

On April 26, 2003, plaintiff was treated following an automobile accident. (Tr. 231-232, 542-551). She had neck and back strain, abrasions, and a sprained ankle. (Tr. 232). X-rays revealed mild degenerative changes at the T6-7 level. (Tr. 235-239). Plaintiff was prescribed Skelaxin and Lortab. (Tr. 232).

On May 12, 2003, plaintiff was treated for lower back pain, otitis media, and bronchitis. (Tr. 227-229, 538-540). She was prescribed Lortab, Zithromax, and Skelaxin. (Tr. 228-229).

On June 24, 2003, plaintiff was diagnosed with knee strain. (Tr. 225-226, 536-537). An examination revealed a normal range of motion with diffuse tenderness in the right knee. The doctor prescribed Lortab and a knee immobilizer. (Tr. 225-226).

On June 29, 2003, plaintiff sought treatment for a headache, nausea, and vomiting. (Tr. 222-224, 534-535). Plaintiff was given injections of pain medication and told to obtain a primary care physician to manage her chronic headaches and other medical needs. (Tr. 223).

On August 22, 2003, plaintiff was treated in the emergency room after being hit in the left arm with a baseball bat. (Tr. 191-193). X-rays revealed an ulnar fracture without complications. She was given injections of Demerol and Phenergan and her arm was placed in splint. (Tr. 191-193).

On October 7, 2003, plaintiff's x-rays revealed the formation of a large callus. (Tr. 300, 398, 493-494). Dr. Moore noted that her wrist looked good, although plaintiff did experience some pain with motion. He prescribed a removable splint for her left wrist to be removed 4 times per day for range of motion exercises. (Tr. 300, 398).

On November 1, 2003, plaintiff was again treated for back pain. (Tr. 209-210, 298, 523-525). X-rays revealed that the ulna fracture was healing well. (Tr. 298, 397). Plaintiff's arm and grip were also strengthening. (Tr. 298, 397). Plaintiff was given prescriptions for Hydrocodone, Flexeril, and Naprosyn and released home. (Tr. 211).

On December 8, 2003, plaintiff stated that she had attempted to do her exercises but was unable to do so due to cramping. (Tr. 296, 396, 489-490). She also indicated that she was

6

experiencing some night numbness in both hands. Dr. Moore diagnosed plaintiff with bilateral carpal tunnel syndrome and ordered a median nerve conduction study of both wrists. (Tr. 296, 396).

On January 27, 2004, plaintiff indicated that she had not undergone nerve conduction studies because she could not afford to do so. (Tr. 294, 395, 487-488). She stated that her hands were tingling off and on all day and that the sensations in her hands disrupted her sleep. A physical exam revealed decreased sensation in the median nerve distribution of both hands with positive Tinel's signs. Dr. Moore gave plaintiff wrist splints and told her to take Ibuprofen. (Tr. 294, 395).

On March 18, 2004, plaintiff reported that her symptoms were getting worse. (Tr. 292, 393, 485-486). She stated that her hands were going completely numb at night, especially her thumb, index finger, and middle fingers. She indicated that it took ten minutes to get the feeling to return. An examination revealed decreased sensation in the tips of both thumbs, index finger, and middle finger. (Tr. 292, 393, 485). Dr. Moore indicated that plaintiff had symptoms and physical findings consistent with bilateral carpal tunnel syndrome which had been present since she was hit on the left forearm and suffered a fractured ulna. He was of the opinion that she needed to obtain median nerve conduction studies across both wrists. (Tr. 292, 393-394)

On September 27, 2004, plaintiff was treated for a headache and bilateral shoulder, upper back, and hand pain. (Tr. 500-504). The doctor noted that plaintiff also had decreased peripheral vision. An examination revealed tenderness to palpation over the posterior shoulders between the scapula. (Tr. 503). Plaintiff was diagnosed with upper musculoskeletal pain and back pain and discharged home with a prescription for Ibuprofen. (Tr. 504). The doctor also advised her to use warm moist compresses as needed. (Tr. 504).

On November 19, 2004, plaintiff underwent carpal tunnel release surgery on her left arm. (Tr. 483-484). Dr. Bryan Benafield performed the surgery. (Tr. 483-484).

On December 6, 2004, plaintiff complained of pain in her shoulders, back, hands, and ankles. (Tr. 381). Dr. Don Harper noted bilateral tenderness over the carpal tunnel, bilateral popping in the knees, and lumbar spasms. He diagnosed her with polyarthritis, tunnel vision, and tension headaches. Plaintiff reported experiencing 2-3 severe headaches per year and 3-4 moderate level headaches per month. She indicated that the pain was generally located behind her eyes and was accompanied by neck stiffness. Dr. Harper prescribed Naproxen, Midrin, Flexeril, and Zoloft. (Tr. 381).

On December 30, 2004, nerve conduction studies revealed low normal right median motor distal latency. The right median sensory conduction time was also delayed as compared to the ulnar sensory conduction. Results for the left side were normal. Accordingly, plaintiff was diagnosed with minimal conduction of the right median nerve consistent with mild median neuropathy at the carpal tunnel. (Tr. 392).

This same date, Dr. Moore diagnosed plaintiff with mild carpal tunnel syndrome. (Tr. 481). Plaintiff reported that her hands were getting worse and that numbness interrupted her sleep approximately 5-6 times per night, even while wearing her wrist splints. She also stated that she could not write without experiencing cramps. Dr. Moore noted pain in the right shoulders with decreased sensation of the medial nerve distribution and some crepitus in the wrist joint. He prescribed new wrist splints and ordered an arthritic profile. Dr. Moore also referred her to Dr. Mitchell for an evaluation of her right shoulder or knee problems. (Tr. 481).

On January 5, 2005, plaintiff reported lower abdominal pain. (Tr. 379). Dr. Noted lumbar spasms and pain in the lower back with leg movement. He prescribed Zoloft, Trazodone, and another medication. (Tr. 379).

On January 17, 2005, Dr. Harper noted lumbar spasms and spasms in her upper right extremity. (Tr. 378). He referred her to Dr. Moore. (Tr. 378).

On January 20, 2005, an examination of plaintiff's hands was unchanged. (Tr. 475). Although Dr. Moore noted good sensation, plaintiff continued to experience night numbness and some crepitus and popping in the dorsum of both wrists. Night splints were reportedly not helping and plaintiff was having to take them off due to the pain. (Tr. 475-476).

This same day, plaintiff told Dr. Carl Kendrick that she hurt all over. (Tr. 477). He noted that plaintiff was seeing him primarily due to back pain but had also reported headaches and some pain along the base of her neck. An examination revealed a limited range of motion in her lower back with a normal range of motion in the neck. X-rays of her cervical spine were completely normal, while x-rays of her lumbar spine showed some narrowing of the L5 disc space at the L5-S1 level and some significant facet changes. Dr. Kendrick believed that plaintiff's main problem was facet syndrome of the lower back and a muscular problem in her neck. He prescribed physical therapy and rehabilitation for both issues and advised her to take Tylenol for her discomfort. (Tr. 477).

On January 20, 2005, plaintiff also requested that Dr. Mitchell examine her knee. (Tr. 479). She had reportedly been to the emergency room several times with regard to it. Plaintiff stated that it had been locking and "giving way for years." Dr. Mitchell noted a negative McMurray's test with

9

tenderness in her joint lines. Plaintiff also had a full range of motion with no instability and a negative patellar apprehension sign. He could find no explanation for why plaintiff's knee was giving way. As such, Dr. Mitchell ordered an MRI. He also noted that an examination of her right shoulder was within normal limits. (Tr. 479).

On January 27, 2005, plaintiff reported that the Trazodone was not helping her sleep. (Tr. 377). Dr. Harper diagnosed her with depression and insomnia and switched her to Remeron. (Tr. 377).

On January 31, 2005, Dr. Harper noted no changes in plaintiff's condition. (Tr. 376).

On April 5, 2005, an MRI revealed meniscal degeneration with no clear cut tearing in plaintiff's right knee. (Tr. 474). An examination revealed continued patella femoral syndrome in both knees, worse on the right side. Dr. Mitchell noted that plaintiff was losing weight and that this would likely help her knee. However, he was not certain that surgery would help this condition. (Tr. 474). Dr. Mitchell recommended physical therapy but agreed with plaintiff's desire to save her physical therapy visits for after plaintiff's carpal tunnel release surgery. Dr. Moore was reportedly awaiting the results of this MRI before scheduling plaintiff for surgery. Dr. Mitchell recommended that Dr. Moore move forward with the procedure. (Tr. 474).

In spite of this evidence, the ALJ determined that plaintiff could perform light work requiring only occasional grasping and fingering. However, the evidence reveals that plaintiff was only 5 feet 5 inches tall and weighed between 220 and 230 pounds. (Tr. 563). In spite of undergoing carpal tunnel surgery on her left arm, she continued to experience complications related to carpal tunnel syndrome and was about to undergo surgery on her right arm. Further, plaintiff's right knee was

10

giving way and she was experiencing pain associated with meniscal degeneration. Plaintiff was also repeatedly treated for headaches and lower back pain related to the narrowing of the L5 disc space at the L5-S1 level and some significant facet changes. Treatment records support plaintiff's allegations concerning her subjective complaints and reveal that she was prescribed strong pain medications and muscle relaxers to treat her symptoms. (Tr. 88, 151, 181, 183, 192, 211, 213, 226, 228, 229, 245, 247, 294, 477).

We note that Dr. Harper, one of plaintiff's treating doctors, completed an RFC assessment. He determined that plaintiff could only occasionally bend, carry, climb, kneel, lift, squat, and reach. (Tr. 402-404). He did not, however, assess the limitations related to plaintiff's carpal tunnel syndrome. At any rate, the limitations assessed by Dr. Harper are not reflected in the ALJ's RFC assessment. Likewise, the assessment does not properly take into account the limitations associated with carpal tunnel syndrome. Accordingly, we believe that remand is necessary to allow the ALJ to reevaluate plaintiff's RFC.

On remand, the ALJ is directed to address interrogatories to the physicians who have evaluated and/or treated plaintiff, asking them to review plaintiff's medical records; to complete a mental and physical RFC assessment regarding plaintiff's capabilities during the time period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding plaintiff's ability to perform basic work activities on a sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

**Conclusion:**

Based on the foregoing, we reverse the ALJ's decision and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

ENTERED this 4th day of October 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)